2012 Ark. App. 249

Betty BERTHELOT, Appellant

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.

No. CA 11–1244.

Court of Appeals of Arkansas.

April 11, 2012.

Leah Lanford, Arkansas Public Defender, Little Rock, for Appellant.

Tabitha Baertels McNulty, Little Rock, Melissa Richardson, Jonesboro, for Appellees.

DAVID M. GLOVER, Judge.

Appellant Betty Berthelot appeals the trial court's adjudication of her daughter, J.A., dependent/neglected as a result of sexual abuse. On appeal, she argues that the trial court erred in finding that DHS established sexual abuse by a preponderance of the evidence and that the trial court committed reversible error by allowing into evidence statements of hearsay contained in the report to the prosecuting attorney. We affirm the trial court's decision.

### Facts

The facts of this case are somewhat unusual. Berthelot is the maternal biological grandmother to J.A. (dob 4–14–03) and her three older siblings—sister Ja.A. (dob 12–29–95) and brothers Jo.A. (dob 1–2–97) and Jm.A. (dob 2–5–00). Berthelot adopted the sibling group in 2007 after the children's biological mother and father's parental rights were terminated in the state of Missouri. Nevertheless, at the time of J.A.'s removal from Berthelot's home, the children's biological mother, Christina Adams, and her boyfriend/fiancé, Steven Beasley, lived in the other side of the duplex occupied by Berthelot and the children, and it appears from the testimony that the children moved freely between the two units.

On June 6, 2011, DHS filed a petition for emergency custody and dependency/neglect with supporting affidavit against Berthelot, alleging that J.A. had reported that she had been sexually abused by her two brothers, Beasley, and maternal uncle Chris Wise, and it was necessary to remove J.A. from Berthelot's custody to protect her health, safety, and physical well-being. The affidavit stated that Berthelot initially told investigators that she had walked in on J.A., Jo.A., Jm.A., and a nine-year-old female friend of the children unclothed, with the boys performing sexual acts on the girls, and she told them to stop; however, Berthelot later denied that the children were engaged in sexual acts, stating instead that the children were just "humping" on each other. Berthelot told investigators that J.A. "will make up stories," and denied that either Jo.A. or Jm.A. would touch J.A. in a sexual way. Due to the sexual allegations, DHS took a seventy-two-hour emergency hold on J.A. on June 1, 2011, and was granted emergency custody on June 6, 2011. A probable-cause order was filed on June 13, 2011. An adjudication hearing was held, and an order adjudicating J.A. dependent/neglected was filed September 13, 2011. Berthelot filed a timely notice of appeal on September 30, 2011.

Due to scheduling conflicts, the adjudication hearing was held over several days. On the first day of the adjudication hearing, Suzanne Cartwright, a school counselor at J.A.'s elementary school, testified that on June 1, J.A. had been sent to her office to talk because her "private parts" hurt; J.A. told Cartwright that she played the "baby-humping game" with her brothers and it made her private parts hurt. She explained to Cartwright that the game was played by her brothers getting on top of her, kissing her, and rubbing their private parts on her. Cartwright said that J.A. only accused her brothers of playing this game with her.

Karis Chastain, an investigator with the Arkansas State Police Crimes Against Children Division, testified that she interviewed J.A. at the Children's Safety Center. That interview was recorded on a DVD, which both attorneys, but not the trial court, had seen and had no objection to it being placed into evidence. Chastain stated that she had not yet completed her investigation, but she did have a tentative finding that was pending approval. Due to the fact that Chastain's investigation was not yet complete and the trial court had not had an opportunity to view the DVD, the hearing was continued. When the adjudication hearing was continued at a later date, Chastain continued her testimony, testifying that she found the allegations concerning sexual contact and sexual penetration with J.A. to be true for Jo.A., Jm.A., and Steven Beasley and that her report had been forwarded to the prosecuting attorney.

Angela Wood, a DHS family-service worker, testified that based upon J.A.'s allegations of sexual abuse by her brothers, her uncle, and her biological mother's boyfriend, she had concern for other children in the home, but that Berthelot was very uncooperative with her. Wood stated that Berthelot was unable to formulate a plan to keep the children safe, that she did not believe a plan was needed because she did not believe that anything was happening in the home, and that J.A. was just making everything up. When Wood asked Berthelot about her walking into the room when the children were unclothed and performing sexual acts together, Berthelot denied saying that, stating instead that she had walked in on the children fully clothed, that they were "humping" each other, and that she told them to stop. Wood expressed concern that Berthelot believed that J.A. was just making up stories.

Tara Marcom, J.A.'s caseworker, testified that J.A. had several placements since coming into DHS custody and had to be removed from one placement for acting out sexually. However, she said that J.A. was currently in a placement in which she was doing very well. It was her recommendation that J.A. remain in DHS custody at the time.

Berthelot testified that J.A. had told her that her "pee-pee" hurt. She said that usually meant that J.A. had a urinary tract infection; that J.A. had those infections off and on for about three years; and that when she got an infection, she was given antibiotics. She said that J.A. had trouble with "storytelling," crying wolf, and behavioral problems. Berthelot said that J.A. bit kids at school and raised her dress up in the air. She denied that J.A. had ever told anyone that she had been sexually abused; however, she also testified that J.A. had made previous accusations of sexual abuse against her older sister and that sister's boyfriend, a little girl who lived across the street, and while in a previous foster-care situation—and that those allegations had been determined to be unfounded. She denied being uncooperative about instituting a safety plan. She also stated that she had not failed to protect

J.A. because J.A. was never left at home with any males. However, she also testified that she walked into a bedroom and found Jo.A. lying on the bed on his side and J.A. was lying on the bed on her back; both were clothed and Jo.A. was moving his bottom back and forth next to J.A. She said that she told them to stop. She stated that she had no idea about the "humping babies" game; that she had never heard J.A. use the language she used in the video; and that she had never heard her describe a sex event like she did in the video. Berthelot stated that she did not believe that Jm.A., Jo.A., or Steven had sex with J.A. because they did not have the opportunity; with regard to where J.A. learned about sexual vocabulary and issues that she spoke about on the video, Berthelot said that she must have heard people talk or that she saw things on television. Berthelot admitted that she was not present when J.A. was spending time at her biological mother's house.

Jm.A. and Jo.A. were called to the witness stand, but the trial court invoked their right to remain silent and appointed both of them attorneys. Ja.A. stated that J.A. had accused her in the past of trying to rape her. Ja.A. said that she did not think J.A. was a truthful person and did not think that she was being truthful on the video. She said that J.A. had never told her about being sexually abused by anyone.

Steven Beasley testified that what J.A. said about him was false, but he did not want to call it lying. He said that he was not aware of any improper sexual contact or conduct with J.A. occurring in his home.

Although J.A. did not testify at the adjudication hearing, the DVD of her interview with Karis Chastain was admitted into evidence without objection. In this interview, J.A. explained that she and her two brothers played the "humping baby" game

where she got on top of Jo.A. with her clothes on and kissed him on the mouth, and then they got naked and started humping each other. J.A. explained their actions in further detail and said that it "felt kinda good." J.A. also reported what she described in graphic vernacular as a specific rubber sex aid in her biological mother's closet and that she had touched it. When asked again about Jo.A., J.A. indicated, using dolls, the acts of sexual intercourse, anal intercourse, and oral sex in explicit detail, including ejaculation, which she identified in her own words as "sperm." She further recounted incidents of sexual contact with Christopher, Jm.A., and Steven. She also recounted sexual acts with her friend "Diana," a person no one involved in the case could identify or locate.

At the close of the multiple-day hearing, the trial court found that DHS had met its burden of proof by a preponderance of the evidence that J.A. was sexually abused by her brothers; that she was in danger; and that she was to remain in DHS custody. The trial court stated that the DVD of J.A.'s interview was credible—specifically, the trial court found that J.A. gave a credible explanation of how the sex act occurred using the dolls, and that she knew what "sperm" looked like. The trial court stated that it was pretty horrific with regard to the details J.A. knew about sex acts. Furthermore, the trial court believed that Berthelot was uncooperative with regard to implementing a safety plan even though the alleged perpetrators lived with J.A. and next door to her.

### Sufficiency Argument

The standard of review in dependency/neglect cases· on appeal is de novo, but the appellate courts do not reverse the trial judge's findings unless they are clearly erroneous or clearly against the pre-

ponderance of the evidence. *Lipscomb v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 257, 2010 WL 961547. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* In making its decision, the appellate court gives due regard to the circuit court's opportunity to judge the credibility of the witnesses. *Anderson v. Arkansas Dep't of Human Servs.*, 2011 Ark. App. 522, 385 S.W.3d 367.

On appeal, Berthelot argues that the only evidence that J.A. was sexually abused was her sexual knowledge, and that DHS failed to introduce what an eight-year-old child might know about sex; therefore, for the trial court to speculate was improper. Berthelot contends that there was no factual basis presented at the hearing from which the trial court could infer that J.A. demonstrated knowledge of sexual mechanics not ordinarily possessed by children her age. She points to the fact that there was no medical evidence of sexual abuse; J.A.'s bizarre comments during her interview about her nonexistent friend Diana and their sexual antics, which Berthelot contends support her position that J.A. made up the allegations; and the fact that prior sexual-abuse allegations made by J.A. were found to be unsubstantiated as proof that J.A. was not sexually abused. Although Berthelot contends that J.A. is not a credible witness, she also argues that it is irrelevant whether J.A. was credible because the error lies in the presumption made by the trial court that there was no other explanation for J.A.'s knowledge of sex than sexual abuse.

We find no merit in Berthelot's argument. In her recorded interview, J.A. explains sexual acts with her brothers, her uncle, and her biological mother's boy-friend in explicit detail. She also talked about a sex aid found at her biological mother's house in the closet, as well as recounted stories of her friend Diana (who, by all accounts, seems to be imaginary) and their sexual escapades in the bathroom at school. J.A. used graphic and explicit language in her recorded interview demonstrating a knowledge of sexual matters beyond her tender age of eight years. While some of J.A.'s interview is bizarre, especially the part about Diana, there are specific instances stated by J.A. regarding her brothers, uncle, and biological mother's boyfriend that, if believed, support the dependency/neglect adjudication on the basis of sexual abuse. In fact, Berthelot admits in her argument that if the acts described by J.A. were true, they would constitute sexual abuse.

Berthelot is incorrect that the credibility of J.A.'s statement is not the issue—it is. The trial court found that DHS had met its burden of proof by a preponderance of the evidence that J.A. was sexually abused by her brothers, and that J.A.'s testimony was credible. The trial court noted that J.A. knew what to do with the dolls sexually, and that she knew what "sperm" looked like. The trial court was further concerned that, when confronted with this information, Berthelot was uncooperative and could not come up with a safety plan for the children. The trial court also noted that Berthelot testified that J.A. had been acting out sexually since the age of four or five, and that she had seen Jo.A. moving his bottom back and forth by J.A. and had told him to stop. Because the trial court is in a superior position to evaluate witnesses, the appellate court gives a high degree of deference to the trial court's evaluation of credibility. *Blanchard v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 785, 379 S.W.3d 686. The trial court found J.A. to be credible, and this court defers to that finding.

Berthelot finds fault with the trial court for finding that it was "pretty horrific" the details J.A. knew about sex acts and linking that knowledge to sexual abuse, contending that was speculation; however, Berthelot asks this court to engage in the same speculative behavior and overrule the trial court's credibility finding. This court will not do that. There is substantial evidence to support the trial court's finding that J.A. was dependent/neglected on the basis of sexual abuse.

*Hearsay Argument*

During the hearing, DHS moved to introduce into evidence the investigator's report to the prosecuting attorney. Berthelot's attorney objected on the basis that the report contained hearsay and was therefore inadmissible. The trial court held that the report was admissible, but not the supporting documents that contained hearsay. The trial court specifically asked if there were any supporting documents attached to the report, and DHS stated on two occasions that it was only Chastain's report to the prosecuting attorney. However, the report was entered into evidence with supporting documentation, i.e., interview summaries and medical information, attached to it.

Berthelot contends on appeal that the trial court committed reversible error by allowing the supporting documentation that contained hearsay, as well as the portions of Chastain's report to the prosecuting attorney that were hearsay, to be admitted into evidence. This court will not reverse a circuit court's ruling on the admissibility of evidence absent a manifest abuse of discretion. *Hopkins v. Arkansas Dep't of Human Servs.*, 79 Ark.App. 1, 83 S.W.3d 418 (2002). Furthermore, even if

the circuit court erred in admitting the evidence, the appellate court will not reverse absent a showing of prejudice. *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001).

In support of her argument, Berthelot cites *Donahue v. Arkansas Dep't of Health and Human Servs.*, 99 Ark.App. 330, 260 S.W.3d 334 (2007). She contends that *Donahue* not only stands for the proposition that supporting documentation for a prosecuting-attorney report containing hearsay is not admissible, but that any hearsay statement contained in the prosecuting-attorney report itself is also not admissible.

In *Donahue*, the appellant argued that the circuit court erred in admitting the report to the prosecuting attorney because it contained hearsay and because it contained the results of a computerized voice-stress analysis, or lie-detector test. With respect to the hearsay argument, this court held, "The statute provides that the Report is admissible in any child-maltreatment proceeding. Ark.Code Ann. § 12–12–514.[1] And it specifies the contents of the Report and discusses the supporting documents. But the statute does not say that the supporting documents, which contain hearsay, shall be a part of the Report or are admissible into evidence." 99 Ark.App. at 332, 260 S.W.3d at 335–36. Based upon the holding in *Donahue*, we agree that the supporting documentation should not have been introduced into evidence. However, we hold that Berthelot cannot show that she was prejudiced on this ground, as the trial court ruled that the report's supporting documentation was not admissible and did not consider it,

[1]. This statute is now codified at Ark.Code Ann. § 12–18–701(f) (Repl.2009) and provides, "The report, exclusive of information identifying the person making the notification, shall be admissible in evidence in any proceeding related to child maltreatment."

even though it was erroneously included with the report.

Berthelot also contends that the hearsay statements contained in the report to the prosecuting attorney were inadmissible. She argues that Ark.Code Ann. § 12–18–701(b) (Repl.2009) sets forth the only information that can be included in the report. Subsection (b) provides that the investigation report shall include the following information: (1) the names and addresses of the child and his or her legal parents and other caretakers of the child, if known; (2) the child's age, sex, and race; (3) the nature and extent of the child's present and past injuries; (4) the investigative determination; (5) the nature and extent of the child maltreatment, including any evidence of previous injuries or child maltreatment to the child or his or her siblings; (6) the name and address of the person responsible for the injuries or child maltreatment if known; (7) services offered and accepted; (8) family composition; (9) the source of the notification; and (10) the person making the notification, his or her occupation, and where he or she can be reached.

The portion of the report of which Berthelot complains is the summary recommendation; she argues that the summary contains hearsay statements from the supporting documentation, which tainted the report. Even if this report was erroneously admitted into evidence due to hearsay, Berthelot cannot show that she was prejudiced by it. Unlike *Donahue*, where this court reversed and remanded the case due to the fact that the results of a lie-detector test were admitted in a report, and the trial court made no specific findings of fact with regard to credibility or the weight of the evidence, the present case is distinguishable. Here, the trial court clearly relied upon the DVD of J.A.'s interview, which the trial court found to be credible,

and the explicit sexual statements made by J.A. in that recording, to determine by a preponderance of the evidence that J.A. was dependent/neglected based upon sexual abuse. The DVD was entered into evidence independently and, as discussed above, constitutes sufficient evidence to support the dependency/neglect adjudication without any reference to the prosecuting attorney's report. We find no reversible error.

Affirmed.

GLADWIN and BROWN, JJ., agree.